IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 3, 2021

IN RE AHLEIGHA C.[1]

**Appeal from the Juvenile Court for Cocke County**
**No. TPR-06069A    Brad Lewis Davidson, Judge**

_____

**No. E2020-01683-COA-R3-PT**

_____

The Juvenile Court for Cocke County (the "trial court") entered an order terminating the parental rights of Jose G.L. as to his minor child, Ahleigha C. (the "Child"). The trial court found, by clear and convincing evidence, that Father's rights should be terminated for abandonment and failure to manifest an ability and willingness to assume custody of the Child. Father appeals. Because the Tennessee Department of Children's Services failed to prove either ground for termination by clear and convincing evidence, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed;**
**Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which FRANK G. CLEMENT JR., P.J., M.S., joined. CARMA DENNIS MCGEE, J., filed a separate dissenting opinion.

Brett A. Cole, Seymour, Tennessee, for the appellant, Jose G.L.

Herbert H. Slatery III, Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**BACKGROUND**

The Child at issue was removed from the custody of Shauntel C. ("Mother") by the Tennessee Department of Children's Services ("DCS") on March 5, 2019.[2] At the time,

---

[1] In cases involving minor children, it is this Court's policy to redact names in order to protect the children's identity.

[2] Mother's parental rights are not at issue in this appeal.

DCS did not know the whereabouts of Father. The Child was later adjudicated dependent and neglected.

The Child remained in DCS custody, and it was eventually discovered that Father had been incarcerated in federal prison in Alabama since January 25, 2018. On April 24, 2018, Father plead guilty to conspiracy to possess with intent to distribute marijuana and possession of a firearm in relation to a drug trafficking crime. Father was sentenced to sixty-one months in prison. Accordingly, because Father was incarcerated before the Child's birth[3] and remained incarcerated throughout this case, he has never met the Child and had little involvement with DCS.

DCS filed its petition to terminate Father's parental rights in the trial court on January 9, 2020. The alleged grounds for termination pertaining to Father were abandonment by an incarcerated parent, failure to establish and exercise paternity, and failure to manifest an ability and willingness to personally assume custody of the Child. With regard to the abandonment ground, DCS alleged that Father "has engaged in conduct that exhibits a wanton disregard for the [Child's] welfare by engaging in violent and drug-related crimes just prior to the time that the [C]hild was born." Father was appointed counsel and the case proceeded to a final hearing on December 8, 2020.

By the time of the trial, Father had been transferred to a facility in Texas and participated in the hearing by phone. For its case-in-chief, DCS called two witnesses–DCS team leader Dwane Powers and Father. Mr. Powers testified that he supervised the case worker assigned to the Child. Regarding Father, Mr. Powers stated that they located Father in March of 2019 "based on child support information," and that DCS sent a letter to Father in April 2019. Mr. Powers was able to confirm that Father's incarceration was related to a marijuana trafficking charge and that it "looks like there was a firearm involved" but did not extrapolate beyond that information. Additionally, Mr. Powers confirmed that DCS mailed Father a second letter in September of 2020, but that communication with Father tended to be difficult. According to Mr. Powers, Father never responded to the letters or reached out to DCS in any way; Mr. Powers conceded, however, that he had no way of knowing whether the letters actually reached Father. As to the Child, Mr. Powers stated that she and her sister had been in the same pre-adoptive foster home since they entered DCS custody. According to Mr. Powers, termination of Father's parental rights serves the Child's best interests.

Father testified after Mr. Powers. Father testified that he knew Mother was pregnant with the Child at the time he committed the offense for which he was incarcerated. Father also testified that prior to his incarceration, he was employed as a diesel mechanic and sent Mother money during her pregnancy on a monthly basis. Father confirmed that he had received at least one letter related to child support while in prison, but he testified that he

---

[3] The Child was born in May 2018.

responded right away and never received a response. Father also testified that he does not have access to a phone in his current facility, but he stated that he has written to Mother about the Child two or three times. He also claimed to have told Mother to contact his own mother should she need money, and he further claimed that his mother would like to be able to call the Child's foster family to find out about the Child. Regarding the circumstances of his incarceration, Father testified only that he was arrested after being pulled over at an apartment and that he "just was trying to make some money." Father explained that once released, he plans to return to his wife and three other children in El Paso, Texas. Regarding the Child, Father testified that after he returns home he would like to return to work, "get [his] life together," and be with the Child.

The trial court entered an order terminating Father's parental rights on December 15, 2020, concluding that DCS proved two grounds for termination by clear and convincing evidence. Specifically, the trial court found that Father abandoned the Child through wanton disregard and that Father failed to manifest an ability and willingness to assume custody of the Child.[4] The trial court also concluded that termination of Father's parental rights was in the best interests of the Child. Father filed a timely notice of appeal to this Court on December 16, 2020.

## ISSUES

1. Whether the trial court erred in concluding that DCS proved by clear and convincing evidence that Father's parental rights should be terminated for abandonment by wanton disregard.

2. Whether the trial court erred in concluding that DCS proved by clear and convincing evidence that Father's parental rights should be terminated for failure to manifest an ability and willingness to assume custody of the Child.

3. Whether the trial court erred in concluding that DCS proved by clear and convincing evidence that termination of Father's parental rights is in the best interests of the Child.

## STANDARD OF REVIEW

Our Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v.*

---

[4] DCS did not pursue at trial its third alleged ground for termination, failure to establish and exercise paternity.

- 3 -

*Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016). Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013); *see also* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *Id.* (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights[,]" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.,* 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental

rights. *In re Bernard T.,* 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523–24.

## DISCUSSION

### I.      Grounds for Termination

In order to terminate parental rights, a trial court must find by clear and convincing evidence that: (1) at least one statutory ground for termination of parental and guardianship rights has been established, and (2) termination is in the best interests of the child.  *See* Tenn. Code Ann. § 36-1-113(c).  Here, the trial court found that DCS proved two grounds for termination and we review each ground in turn.

### a.  Abandonment by incarceration – wanton disregard

Abandonment, as defined by Tennessee Code Annotated section 36-1-102, is a ground for termination of parental rights.  Tenn. Code Ann. § 36-1-113(g)(1).  There are several ways in which abandonment may occur; because Father was incarcerated prior to the Child's birth, however, DCS proceeded under the following theory of abandonment:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately  preceding the institution of such action or proceeding, and either has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv).[5]

Section (1)(A)(iv) creates two additional tests for abandonment that apply only when "a parent is incarcerated at or near the time of the filing of the termination petition." *In re Audrey S*., 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005). In the present case, DCS sought and was granted termination of Father's parental rights pursuant to the second test, which asks whether the parent "has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." *Id.* (citing Tenn. Code Ann. § 36-1-102(1)(A)(iv)).

While section 36-1-102(1)(A)(iv) "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child[,]" it is also true that "parental incarceration is not an infallible predictor of parental unfitness." *Id.* at 866 (footnote omitted). Accordingly, incarceration itself does not satisfy this ground for termination; rather, a parent's incarceration is a "triggering mechanism" that permits the court to examine the parent's behavior *prior* to incarceration. *Id.*; *see also In re Trinity H.*, No. M2020-00440-COA-R3-PT, 2020 WL 5110312, at *9 (Tenn. Ct. App. Aug. 28, 2020) ("[I]ncarceration alone is an insufficient basis for establishing the ground of wanton disregard."); *In re Johnathan F.*, No. E2014-01181-COA-R3-PT, 2015 WL 739638, at *13 (Tenn. Ct. App. Feb. 20, 2015) (noting that courts should "avoid making incarceration solely on its own into a de facto ground for termination"). Consequently, under this ground our review is limited to the parent's conduct before he or she was incarcerated but is not confined to the four-month period preceding the parent's incarceration. *In re Sylvia H.*, No. E2020-01009-COA-R3-PT, 2021 WL 1098630, at *4 (Tenn. Ct. App. Mar. 23, 2021) (citing Tenn. Code Ann. § 36-1-102(1)(A)(iv)).

If section (1)(A)(iv) is triggered by incarceration, the court then "take[s] a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Johnathan M.*, 591 S.W.3d 546, 555 (Tenn. Ct. App. 2019) (quoting *In re Audrey S.*, 182 S.W.3d at 866). Although "wanton disregard" is not a defined term, "the actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). This Court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey*

---

[5] Section 36-1-102 was amended in March of 2020; however, we apply the version of the statute in effect at the time the petition for termination was filed on January 9, 2020.

*S.*, 182 S.W.3d at 868–69 (citing *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7–8 (Tenn. Ct. App. Jan. 11, 2005)); *see also In re Johnathan M.*, 591 S.W.3d at 557 ("By defining the term by examples, Tennessee courts have recognized 'wanton disregard' in much the same way as Justice Potter Stewart identified pornography: '[we] know it when [we] see it.'" (quoting *In re Anthony R.*, 2015 WL 3611244, at *2)).

Here, the trial court made the following findings regarding wanton disregard:

> The Court finds that, at the time of the filing of the Petition, the Father was incarcerated on charges of Conspiracy to Possess With Intent to Distribute Marijuana and Possession of a Firearm During An In Relation to a Drug Trafficking Crime. The Father was sentenced to serve 61 months in total during sentencing. Father's incarceration only serves as the triggering event; the Court has seriously considered the *In re Trinity H.* case that was argued in Court and found that Father's pre-incarceration behavior does warrant a finding on this ground. Father committed a very serious drug crime in which he was also employing the use of a firearm. Father committed this crime knowing that he had a child on the way; his decision cost him being a part of the child's life for her first five years, even if she had not been removed by DCS custody.

At the outset, we note that the evidence in the record is scant. Although the trial court found that Father's pre-incarceration behavior warrants termination pursuant to the wanton disregard ground, the record contains little to no evidence regarding Father's pre-incarceration circumstances. Indeed, the proof related to Father's pre-incarceration conduct consists of Mr. Powers' testimony that Father is incarcerated for a drug related crime, and Father's testimony that prior to being arrested he was employed as a diesel mechanic and lived with his wife and children in El Paso. Although our case law requires us to consider whether Father's incarceration is "part of a broader pattern of conduct," DCS presented no proof that assists us in this analysis.[6] *In re Johnathan M.*, 591 S.W.3d at 555. This omission is significant because in cases where wanton disregard is found, but the parent's actions did not "directly threaten the child's safety," more than one type of bad conduct has usually been present." *Id.* at 557 (citing *In re D.M.*, No. M2009-00340-COA-R3-PT, 2009 WL 2461199, *4–5 (Tenn. Ct. App. Aug. 12, 2009)).

Notwithstanding the dearth of evidence regarding Father's pre-incarceration conduct, the trial court concluded that the offense leading to Father's current incarceration

---

[6] To the contrary, Father testified that prior to being incarcerated he was gainfully employed and has never had any issues with substance abuse. He also testified that he sent money to Mother while she was pregnant with the Child. DCS presented no evidence to the contrary, nor did the trial court make a finding that Father was not credible as to these contentions.

was serious enough, standing alone, to amount to abandonment by wanton disregard. DCS also makes this argument on appeal, and both the trial court and DCS point to dicta from *In re Trinity H.*, 2020 WL 5110312, for support. In *Trinity H.*, a trial court also terminated a father's parental rights for abandonment by wanton disregard, finding that:

> [T]he State has established this ground of abandonment by wanton disregard prior to incarceration. Father voluntarily committed the criminal acts that he engaged in with the result that he was incarcerated. His incarceration made him unavailable to parent his child, showing a wanton disregard for the welfare of his child.

*Id.* at *3. The father challenged this finding on appeal, asserting that the juvenile court's findings as to this ground were insufficient. We agreed, explaining as follows:

> DCS is correct in that probation violations, criminal behavior, getting incarcerated repeatedly, substance abuse, and other such conduct may give rise to wanton disregard. In fact, we can well visualize a scenario where a parent's one-time conduct is so egregious that it could, by itself, constitute wanton disregard. However, we have cautioned that it is necessary for courts to "to avoid making incarceration solely on its own into a de facto ground for termination" as our General Assembly "has not deemed it appropriate to make incarceration solely by itself a ground for termination." *In re Jonathan F.*, No. E2014-01181-COA-R3-PT, 2015 WL 739638, at *13 (Tenn. Ct. App. Feb. 20, 2015), *no appl. perm. appeal filed.* Although we made those statements in *In re Jonathan F.* as part of a discussion about noncompliance with a permanency plan, they apply to wanton disregard, as well.

*Id.* at *10. Ultimately, this ground for termination was vacated based on the lack of sufficient findings. *Id.*

In the present case, DCS points to the statement that a parent's "one-time conduct" can be "so egregious that it could, by itself, constitute wanton disregard." *Id.* According to DCS, "[t]his is that scenario." Inasmuch as the record contains paltry evidence about the one-time conduct at issue, we disagree. The only information in the record regarding Father's incarceration is the judgment listing the federal statute under which he was convicted, Mr. Powers' statement that he believed the incident involved a firearm, and Father's statement that he was arrested after "pulling into an apartment complex." Accordingly, the testimony from Mr. Powers was equivocal, and Father's testimony was not illuminative. While we take no issue with the statement of the *Trinity H.* court that a parent's "one-time conduct" may be "so egregious" as to constitute wanton disregard, the very limited proof before us does not establish, as DCS claims, that "[t]his is that

scenario."[7]

When considering whether a parent's criminal conduct constitutes wanton disregard, we consider "the severity and frequency of the criminal acts." *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at \*8 (Tenn. Ct. App. Jan. 14, 2014). In this case, DCS offered insufficient proof as to the severity of Father's single criminal act, and no proof as to whether Father frequently engages in such acts. In light of the "higher standard of proof that is required before a party may be deprived of the constitutional right to be a parent to his or her child[,]" we cannot conclude that DCS satisfied its burden in this case. *In re Renaldo M.*, No. M2016-00472-COA-R3-PT, 2017 WL 1041541, at \*5 (Tenn. Ct. App. Feb. 7, 2017); *see also In re Michael O.*, 2018 WL 576777, at \*7 ("[T]he burden falls on DCS, not [f]ather, to prove [f]ather's wanton disregard of the child by clear and convincing evidence.") (citing Tenn. Code Ann. § 36-1-113(c)(1)). Indeed, "[t]here is no place in a parental termination case-where the stakes are so high-for guesswork and we will not so engage." *State Dept. of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 296 (Tenn. Ct. App. 2006).

Consequently, we reverse the trial court's ruling that clear and convincing evidence supports termination of Father's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(1) and section 36-1-102(1)(A)(iv).

### b. Failure to manifest an ability and willingness to assume custody

Tennessee Code Annotated section 36-1-113(g)(14) provides an additional ground for termination when

> [a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires clear and convincing proof of two elements. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*7 (Tenn. Ct. App. Apr. 4, 2018). The petitioner must first prove that the parent has failed to manifest an ability and willingness

---

[7] We also bear in mind that although "a single instance of bad conduct can lead to a finding of abandonment by wanton disregard, we have also noted that certain redeeming factors may be considered to show that the single instance of bad conduct does not rise to the level of wanton disregard." *In re Michael O.*, No. W2017-01412-COA-R3-PT, 2018 WL 576777, at \*8 (Tenn. Ct. App. Jan. 26, 2018). Here, Father exhibited some redeeming factors, including paying some support for the Child, attempting to communicate with Mother about the Child, and to the extent possible, participating in this case. The record also indicates that at some point, Father took steps to legitimate the Child.

to personally assume legal and physical custody or financial responsibility of the child. *Id.* (citing Tenn. Code Ann. § 36-1-113(g)(14)). The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). As to the first element, our Supreme Court has adopted the interpretation of section 36-1-113(g)(14) set forth in *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280 (Tenn. Ct. App. June 20, 2018). *See In re Neveah M.*, 614 S.W.3d 659, 677–78 (Tenn. 2020) (citing *In re Amynn K.*, 2018 WL 3058280, at *13). That is, that the statute requires "a parent to manifest both an ability and willingness" to personally assume legal and physical custody or financial responsibility for the child. *Id.* Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.*

Regarding the second element of this ground, whether placing the child in the person's custody would "pose a risk of substantial harm to the physical or psychological welfare of the child[,]" we have previously explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Greyson D.*, No. E2020-00988-COA-R3-PT, 2021 WL 1292412, at *8 (Tenn. Ct. App. Apr. 7, 2021) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)) (footnotes omitted).

Addressing this ground for termination, the trial court made the following findings:

> [I]n the time since the children have come into state's custody Father manifested no ability to parent his child. The Court first looks at whether there is a willingness or ability to care for and provide for the child. The court has to answer this question in the negative. Father remained incarcerated up to the date of this trial; documentation indicated that he would not be released until the year 2022. Father certainly cannot be said to be able to care for the child. This leaves whether Father is "willing." The Court looks instead of the time prior to the hearing date, including time after the termination petition was filed. Father, despite learning that his parental rights were to be terminated and that his child was in DCS custody, made no attempts to write letters to DCS or to the child through DCS. Father testified that he could

- 10 -

write infinite letters, but the Court notes he chose not to write them to DCS or the child.

Likewise, the Court cannot say that placement with Father would be safe. Father testified that he has a wife and three kids waiting for him when he gets out of jail; however, this statement cannot be verified and his home has never been checked out because he has not engaged with DCS. The Court cannot say that it would be safe to place a child in a home with so many unanswered questions, especially when Father himself would not be able to reside in the home for approximately two more years while he serves the remainder of his sentence.

Accordingly, the trial court found that Father failed to manifest both the ability and willingness to assume custody of the Child. In reviewing these findings, we bear in mind that manifesting the "ability and willingness to assume legal and physical custody of a child must amount to more than mere words[,]" *In re Ken'bria B.*, No. W2017-01441-COA-R3-PT, 2018 WL 287175, at *10 (Tenn. Ct. App. Jan. 4, 2018), and that "[c]riminal activity . . . raise[s] doubt as to a parent's actual willingness to assume custody or financial responsibility for the child." *In re Kaylene J.*, No. E2019-02122-COA-R3-PT, 2021 WL 2135954, at *17 (Tenn. Ct. App. May 26, 2021) (citing *In re Amynn K.*, 2018 WL 3058280, at *15); *see also In re Brayden E.*, No. M2020-00622-COA-R3-PT, 2020 WL 7091382, at *5 (Tenn. Ct. App. Dec. 4, 2020) (noting that father's "willful disregard for authority put him in a position where he was unable to care for" his children, which supported termination under section (g)(14)).

As with the first ground for termination, it is clear that the trial court treated Father's incarceration itself as the basis to terminate Father's parental rights, inasmuch nothing else regarding Father can be gleaned from the record. Nonetheless, "parental incarceration is not an infallible predictor of parental unfitness." *In re Audrey S.*, 182 S.W.3d at 866. Moreover, in addressing different grounds for termination, we have cautioned courts to tread carefully in treating a parent's incarcerated status as a de facto basis for termination. *See In re Johnathan F.*, No. E2014-01181-COA-R3-PT, 2015 WL 739638, at *13 (Tenn. Ct. App. Feb. 20, 2015) (addressing substantial noncompliance with a permanency plan and noting that "[c]aution by the courts is appropriate here to avoid making incarceration solely on its own into a de facto ground for termination. . . . a blanket holding that a parent who is unable to complete a permanency plan solely because of his incarceration may, in effect, have his parental rights terminated not because of failure to substantially comply with the permanency plan but, in reality, because of his incarceration"); *see also In re Scarlet W.*, No. W2020-00999-COA-R3-PT, 2021 WL 144232, at *5 (Tenn. Ct. App. Jan. 15, 2021) (addressing Tennessee Code Annotated section 36-1-113(g)(6) and noting that incarceration serves as a basis for termination only under statutorily prescribed circumstances); *In re Kendall M.*, No. E2017-01769-COA-R3-PT, 2018 WL 2411831, at *9 (Tenn. Ct. App. May 29, 2018) ("Incarceration alone [ ] is not a ground for termination

of parental rights[.]"); *In re Ke'Andre C.*, No. M2017-01361-COA-R3-PT, 2018 WL 587966, at *9 (Tenn. Ct. App. Jan. 29, 2018) ("Although [f]ather's incarceration is a serious variable to be considered in the context of several of the grounds alleged for the termination of his parental rights, it cannot stand alone as a de facto bar to [f]ather's right to parent."); *In re K.F.R.T.*, 493 S.W.3d 55, 62 (Tenn. Ct. App. 2016) (Swiney, J., concurring and dissenting) ("Incarceration alone is not, except where statutorily prescribed, a ground for termination of parental rights."). While the foregoing citations do not address section 36-1-113(g)(14), we see no reason why the failure to manifest ground should be treated differently. Indeed, the conclusion that section 36-1-113(g)(14) is not satisfied by the fact of incarceration alone dovetails with well-settled principles of termination law, specifically the heightened burden of proof and the maxim that "not all parental conduct is irredeemable." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citation omitted); *see also In re Adoption of W.J.P.*, No. E2007-01043-COA-R3-PT, 2008 WL 246015, at *11 (Tenn. Ct. App. Jan. 30, 2008) ("The courts understand that persons are able to turn their lives around[.]" (citing *In re Askew*, 993 S.W.2d 1, 2 (Tenn. 1999))).

Based on the limited proof before us, we know nothing of Father's proclivity for parenting other than his claims that he financially helped Mother during her pregnancy and his expressed desire to have a relationship with his daughter after his release. We are also unpersuaded that Father's admission of not writing letters to the Child amounts to clear and convincing evidence under these circumstances, because it was undisputed by DCS that communication with Father was difficult, and because of the Child's young age. Further, Father testified that he attempted to contact Mother regarding the Child several times.

While Father's single instance of criminal activity certainly "raise[s] doubt as to [his] actual willingness to assume custody or financial responsibility for the child[,]" *In re Kaylene J.*, 2021 WL 2135954, at *17, raising doubt is not the same as proving by clear and convincing evidence. *See Furlough v. Spherion Atlantic Workforce, LLC*, 397 S.W.3d 114, 128 (Tenn. 2013) ("Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence." (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992))). Although common sense indicates Father's circumstances are not beneficial to the Child, we cannot say, under the limited proof in this record, that clear and convincing evidence establishes Father's failure to manifest an ability and willingness to assume custody or financial responsibility for the Child.[8]

---

[8] For clarity, the present case should not be confused with cases in which a parent is incarcerated at the time a termination trial occurs, and the petitioner presents additional evidence that the parent is unwilling or unable to parent the child. *See, e.g.*, *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL at *8 (Tenn. Ct. App. Apr. 23, 2020) (concluding that evidence was sufficient for termination pursuant to section (g)(14) where mother was incarcerated at the time of trial, but her children had been removed from her custody due to physical abuse and mother failed to take advantage of all the classes available to her to address her issues); *In re Eli S.*, No. M2019-00974-COA-R3-PT, 2020 WL 1814895, at *8 (Tenn.

Even if we were to conclude that DCS proved the first element of section 36-1-113(g)(14) by clear and convincing evidence, the second element still remains. Specifically, DCS bears the burden of showing that placing the Child in Father's custody poses a risk of substantial harm to the physical or psychological welfare of the child. Tenn. Code Ann. § 36-1-113(g)(14); *In re Enrique F.*, No. M2019-01765-COA-R3-PT, 2021 WL 1885925, at \*12 (Tenn. Ct. App. May 11, 2021) ("[A] finding that placing the child in the parent's custody would pose a risk of substantial harm to the child is a necessary component of [section (g)(14)]."). Because the risk of substantial harm must be "more than a theoretical possibility[,]" we are careful not to equate Father's inmate status, in the absence of any further evidence, with a risk of substantial harm. Indeed, regarding section 36-1-113(g)(9)(A)(v), the text of which is nearly identical to the second prong of section (g)(14), "[w]e have never held that a parent's mere status as an inmate clearly and convincingly establishes that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at \*9 (Tenn. Ct. App. June 6, 2017); *see also In re Ken'bria B.*, 2018 WL 287175, at \*10 (also addressing section (g)(9)(A)(v) and explaining that "we are cautious on this ground not to equate Father's incarcerated status directly with the threat of substantial harm").[9]

DCS correctly notes in its brief that under some circumstances, proof of a strong bond between a child and a foster family amounts to clear and convincing evidence that the child is at risk of substantial psychological harm if removed from the current placement. *See, e.g.*, *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at \*17 (Tenn. Ct. App. July 22, 2020) (risk of substantial harm shown by evidence that child was

---

Ct. App. Apr. 9, 2020) ("[W]e agree with the trial court that Mother's **history of drug abuse** and both parents' **repeated criminal conduct** and resulting incarceration demonstrates that each lacks the ability to parent [the child].") (emphasis added). A parent's repeated misconduct is certainly relevant to this ground, and we have already explained that a parent's criminal conduct "raise[s] doubt as to [his] actual willingness to assume custody or financial responsibility for the child." *In re Kaylene J.*, 2021 WL 2135954, at \*17. However, the instant case is distinguishable from the above-cited cases due to the lack of evidence presented by DCS, and our holding is limited to these particular circumstances.

[9] Tennessee Code Annotated section 36-1-113(g)(9)(A)(v) applies only to putative fathers and provides that a putative father's parental rights may be terminated when "[p]lacing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re E.C.* and *In re Ken'bria* both address section (g)(9)(A)(v), but in light of the similar language to section (g)(14), we nonetheless find these cases instructive. Further, this is not the first case in which we have applied *In re E.C.* and *In re Ken'bria B.* when discussing what constitutes a risk of substantial harm pursuant to section (g)(14). *See In re Autumn D.*, No. E2020-00560-COA-R3-PT, 2020 WL 6306056, at \*5 (Tenn. Ct. App. Oct. 28, 2020) (relying on the above cited cases in its discussion of section 36-1-113(g)(14), noting that "the only finding that the trial court makes concerning [f]ather's present inability to parent his children relates solely to his incarceration"). The salient point here is that a risk of substantial harm must be more than a theoretical possibility, which is true regardless of whether termination is sought pursuant to section (g)(14) or section (g)(9)(A)(v).

"bonded and thriv[ing] in his current family situation"); *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (holding that substantial harm could be established based in part on child's expressed fear of being removed from his foster family and tender age of removal); *In re Ken'bria B.*, 2018 WL 287175, at *10 (concluding that risk of substantial harm was proven when "testimony in the record establish[ed] the strong bond" between the child and her foster family).

Here, however, there is minimal proof in the record regarding the Child's current circumstances. Mr. Powers stated that the Child remains in the same placement and refers to her foster parents as her parents, but DCS did not present testimony from the foster parents or anyone else regarding the Child's current placement. DCS simply failed to establish by clear and convincing evidence that the Child would be at a risk of substantial harm if she were to be removed from the foster parents. As with Father, we can discern very little about the Child and her circumstances based on the record before us. Inasmuch as we are forced to speculate as to what would befall the Child if she were removed from her current placement, we are unpersuaded that the second prong of section 36-1-113(g)(14) was proven by clear and convincing evidence. *See T.M.B.K*, 197 S.W.3d at 296 (noting that we do not engage in "guesswork" in parental termination cases).

Accordingly, the trial court's finding that clear and convincing evidence supports termination of Father's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(14) is reversed. Because no grounds for termination were proven, the issue of the Child's best interests is pretermitted.

## CONCLUSION

The judgment of the Juvenile Court for Cocke County is reversed. Costs of this appeal are taxed to the appellee, the Tennessee Department of Children's Services, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE